AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT

**4/7/22**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ slo _____ DEPUTY

**LODGED**
CLERK, U.S. DISTRICT COURT

4/7/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ vam _____ DEPUTY

| | |
|---|---|
| United States of America | |
| v. | |
| German Gomez, | Case No.   2:22-mj-01409-DUTY |
| Defendant(s) | |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Between on or about February 7, 2022, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution of Methamphetamine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ James Chung*
_____
Complainant's signature

James Chung, ATF Special Agent
_____
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:      4-7-22

*Judge's signature*

City and state:   Los Angeles, California       Hon. John McDermott, U.S. Magistrate Judge
_____
Printed name and title

AUSA: Lynda Lao (x7167)

<u>AFFIDAVIT</u>

I, James Chung, being duly sworn, declare and state as follows:

**I.** <u>PURPOSE OF AFFIDAVIT</u>

1.    This affidavit is made in support of a criminal complaint and arrest warrant against GERMAN GOMEZ ("GOMEZ") for a violation of 21 U.S.C. § 841(a)(1): Distribution of Methamphetamine.

2.    This affidavit is also made in support of an application for a warrant to search a black Samsung Galaxy Note 9 seized from **GOMEZ** on April 6, 2022 (the "**SUBJECT DEVICE**"), as described more fully in Attachment A.

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) and 846 (possession with the intent to distribute methamphetamine, and conspiracy and attempt to distribute methamphetamine, respectively); 18 U.S.C. §§ 922(a)(1)(A) (engaging in the business of dealing in firearms without a license); 922(g)(1) (felon in possession of a firearm and ammunition); and 371 (conspiracy) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest

warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. <u>**BACKGROUND OF AFFIANT**</u>

5.    I am a Special Agent ("SA") with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been so employed since July 2020. I am currently assigned to the Glendale I Field Office of the Los Angeles Field Division of ATF, which conducts investigations into violations of federal firearms, explosives, and narcotics laws. My experience as an ATF Special Agent includes, but is not limited to, conducting physical surveillance, executing search and arrest warrants, and participating in controlled drug/gun purchase operations, including informants.

6.    As part of my training, I attended the Criminal Investigator and Special Agent Basic Training Academies for ATF at the Federal Law Enforcement Training Center in Glynco, Georgia for approximately 26 weeks. This training included instructions on federal and state firearms and narcotics laws and regulations.

7.    I have experience in investigations involving violations of federal statutes governing firearms, explosives, and narcotics. I have also participated in investigating violations of state firearms and narcotics laws. I have assisted in the execution of state and federal search warrants. I have

also conducted surveillance of individuals committing crimes of violence, individuals trafficking firearms, individuals trafficking illegal narcotic substances, prohibited persons in possession of firearms, and persons possessing illegal firearms. I have participated in the interviews of criminal defendants, informants, and witnesses. Additionally, I have participated in the seizure of records and other types of evidence that documents activities in both firearms trafficking and the manufacturing and distribution of controlled substances.

8.   Prior to my employment with ATF, I was a Probation Officer with the New York City Department of Probation for two years.

### III.  SUMMARY OF PROBABLE CAUSE

9.   Between January 2022 and February 2022, **GOMEZ** sold firearms and methamphetamine to ATF undercover agents ("UCs") on seven different occasions. **GOMEZ**, a convicted felon, sold a total of 36 firearms and 2 pounds of methamphetamine during that time period.

10.  On April 6, 2022, **GOMEZ** attempted to sell two firearms to a UC and was arrested. The **SUBJECT DEVICE** was seized from the front seat of his car when he was arrested.

### IV. STATEMENT OF PROBABLE CAUSE

11.  Based on my review of law enforcement reports, affidavits, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    Background**

12.   On or about January 10, 2022, Special Agents and Task Force Officers with Homeland Security Investigations ("HSI") notified ATF that HSI had received information from a confidential informant ("CI")[1] that **GOMEZ** is selling firearms and narcotics in the Los Angeles area. The CI was in communication with **GOMEZ** via WhatsApp messages and **GOMEZ** sent pictures of firearms to the CI during their conversation. The CI was instructed, at the direction of law enforcement, to set up a deal with **GOMEZ** to purchase firearms.

**B.    January 18, 2022: First Meeting to Purchase of Three Handguns**

13.   On January 18, 2022, the CI and an ATF UC set a meeting with **GOMEZ** at an undercover location in Los Angeles, California (the "UC location").

14.   On this same date, ATF Special Agents, HSI Task Force Officers and LAPD Officers made preparations for the meeting at the UC location. The UC location was equipped with audio and visual recording devices that were set up to capture the meeting with **GOMEZ.**

15.   At approximately 1:17 p.m., **GOMEZ** arrived at the UC location in a Red Dodge Durango and retrieved a suitcase from the trunk of his vehicle. **GOMEZ** opened the suitcase and took out

---

[1] During the course of the investigation of **GOMEZ,** the CI was present for only one deal. The CI has one conviction for a 2001 narcotics felony. S/he has been a CI since 2014 with HSI and is considered reliable and credible. The CI has been paid by HSI approximately $407,000 to date. The CI has also received immigration benefits in the past but is not currently receiving immigration benefits.

three firearms, later identified as a Kel-Tec, model PLR16, 5.56 caliber pistol bearing serial number P2J47; a Ruger, model 57, 5.7 caliber pistol, bearing serial number 643-34526; and a Glock, model 22, .40 caliber pistol, bearing serial number BUHP783. The UC agent purchased the firearms from **GOMEZ** for $6,200 in ATF funds. **GOMEZ** and the UC agent discussed the various types of firearms and narcotics that **GOMEZ** can provide to the UC agent in the future. **GOMEZ** provided contact telephone number (323) 819-5831 and the UC agent instructed **GOMEZ** to contact him directly going forward. **GOMEZ** then entered his vehicle and departed the location.

    **C.   January 21, 2022: Purchase of Three Handguns and One Rifle**

16.  On or about January 31, 2022, the UC agent was in contact with **GOMEZ** via WhatsApp. **GOMEZ** stated that he had additional firearms for sale. **GOMEZ** arrived at the UC location in the Red Dodge Durango and retrieved a backpack and two small black plastic boxes from the trunk of his vehicle. **GOMEZ** opened the two small black plastic boxes and took out three firearms, and then **GOMEZ** opened the backpack and took out one additional firearm. The UC agent purchased the four firearms, later identified as a Polymer80, model PF940V2, .40 caliber pistol, with a Glock 22 slide bearing serial number BLEC413; a FN, model FNX-45 Tactical, .45 caliber pistol, bearing serial number FX3U121799; a Kimber, model Stainless II, .45 caliber pistol bearing serial number K570749; and a Kel-Tec model SU-16, 5.56

caliber rifle bearing serial number N4B62, all for $7,600. **GOMEZ** then entered his vehicle and departed the location.

### D.   February 7, 2022: Purchase of Three Handguns and Two Pounds of Methamphetamine

17.   On or about February 7, 2022, the UC agent and **GOMEZ** were in contact via WhatsApp and arranged to purchase firearms and two pounds of methamphetamine. **GOMEZ** arrived at the UC location in the Red Dodge Durango and retrieved a backpack from the trunk of his vehicle. The UC agent and **GOMEZ** proceeded to the lounge area of the location. **GOMEZ** opened the backpack and took out a blue cardboard Capri Sun box and two firearms, then **GOMEZ** reached into his pocket and took out an additional firearm wrapped in a yellow rag. The UC agent opened the Capri Sun box and took out two vacuum sealed bags of suspected methamphetamine (which later weighed at approximately 907 grams).

18.   The UC agent discussed future firearms purchases with **GOMEZ** and asked if **GOMEZ** could provide a large number of the similar type of new firearms at one time. **GOMEZ** then made a phone call to an unknown individual (while speaking both English and Spanish), **GOMEZ** stated on the phone (in English), "Hey, remember your brother was tellin' me . . . the ones that I have to pre-order. . . how many, most I can get at one time. . . five at a time? . . . my boy want them new. . . they got to be in a box. . . what about the ones that your brother was tellin' me, cause you got to pre-order them. . . cause they want a lot." **GOMEZ** then ends the phone conversation and told the UC agent that he could provide five new firearms at a time.

19.   The UC agent purchased the three firearms, later identified as: a Ruger model P89, 9mm pistol, bearing serial number 310-39115; a Taurus, model PT145, .45 caliber pistol bearing serial number NVM 50692; and a Beretta, model 9000S, 9mm pistol bearing serial number SZ001966, all for $5,100. The UC agent also purchased the two vacuum sealed bags of suspected methamphetamine for $2,400. **GOMEZ** then entered his vehicle and departed the location.

**E.    February 10, 2022: Purchase of Sixteen Handguns**

20.   On or about February 10, 2022, the UC agent and **GOMEZ** were in contact via WhatsApp and arranged a firearms purchase. Prior to the operation, LAPD Officers initiated surveillance of **GOMEZ** and observed **GOMEZ** carry a large brown cardboard box from a residence on 58th Street in Los Angeles, into a Red Dodge Durango. Surveillance units observed **GOMEZ** enter the Red Dodge Durango and drive to the UC location.

21.   **GOMEZ** arrived at the UC location in the Red Dodge Durango and retrieved a large brown cardboard box from the trunk and a backpack from the rear passenger seat of his vehicle. There were two ATF UC agents for this meeting. **GOMEZ** took out two firearms from the backpack as the UC agents opened the cardboard box containing 14 additional firearms. **GOMEZ** then received an incoming call and spoke to an unknown individual in Spanish.

22.   The UC agents purchased the 16 firearms, later identified as Armscor, model M1911-A1 FS, .45 caliber pistols, bearing sequential serial numbers RIA2477444 through RIA247757

and RIA2477250 through RIA2477251, for $27,200. **GOMEZ** then entered his vehicle and departed the location. LAPD surveillance units conducted mobile surveillance as **GOMEZ** departed the UC location. **GOMEZ** was observed operating his vehicle in a reckless manner, driving in and around traffic in a manner consistent with counter surveillance. LAPD units then terminated surveillance.

**F.    February 15, 2022: Purchase of Seven Handguns**

23.   On or about February 15, 2022, the UC agent and **GOMEZ** were in contact via WhatsApp and arranged to purchase additional Armscor M1911 firearms.

24.   **GOMEZ** arrived at the UC location and retrieved a large cardboard box from the trunk of his vehicle. There were two undercover ATF agents for this meeting.

25.   **GOMEZ** opened the cardboard box and the UC agents took out seven firearms. **GOMEZ** then made a phone call to an unknown individual (while speaking both English and Spanish), **GOMEZ** stated on the phone (in English) "we were wondering if you could get a box…" then proceeds to speak in Spanish. **GOMEZ** hung up the phone and told the UC agent "as soon as they come through, my boys gonna get us a box."

26.   The UC agents purchased the seven firearms, later identified as Armscor, model M1911-A1 FS, .45 caliber pistols, bearing sequential serial numbers RIA2477535 through RIA2477541, for $11,900.

27.   On February 17, 2022, the Honorable Alka Sagar, United States Magistrate Judge for the Central District of California,

signed a federal warrant, case number 2:22-MJ-00651, for the
installation of a tracking device for **GOMEZ**'s 2016 Dodge
Durango, California license plate 8JIY370.

### G.   February 20, 2022: Purchase of One Handgun and Three Rifles

28.   On or about February 20, 2022, the UC agent and **GOMEZ**
were in contact via WhatsApp and arranged to purchase firearms.
**GOMEZ** stated he has two rifles and an "AK" for sale. **GOMEZ**
arrived at the UC location in a White Chevrolet Box Truck
bearing CA plate number 28693J3 and retrieved two rifles wrapped
in paper, a cardboard box containing another rifle, and one
revolver wrapped in paper from the cargo trunk area of his
vehicle. Two UC agents were present for this meeting.

29.   The UC agents purchased the four firearms, later
identified as a Colt, model New Service, .45 caliber revolver,
bearing serial number 121653; a Marlin Firearms Co, model 60,
.22 caliber rifle, bearing serial number 24381048; a Universal
Firearms Corp. model M1, .30 caliber rifle, bearing serial
number 453307; and a Norinco, model 56S-1, 7.62 caliber rifle,
bearing serial number 515774. The UC agent purchased the four
firearms from **GOMEZ** for $6,500. **GOMEZ** then entered his vehicle
and departed the UC location.

### H.   February 22, 2022: Purchase of Two Pounds of Methamphetamine

30.   On or about February 22, 2022, the UC agent and **GOMEZ**
were in contact via WhatsApp and arranged to purchase two pounds
of methamphetamine. **GOMEZ** arrived at the UC location in the Red
Dodge Durango and retrieved two small brown paper bags from the

trunk of his vehicle. There were two ATF undercover agents for this meeting.

31.  **GOMEZ** put the two small brown paper bags on the table, and the UC agents opened one bag each and pulled out two clear zip lock bags containing suspected methamphetamine (which later weighed at approximately 907 grams).

32.  The UC agents purchased the two pounds of suspected methamphetamine for $2,400 in ATF funds. **GOMEZ** then entered his vehicle and departed the location.

33.  I field tested a sample from each zip lock bag of suspected methamphetamine. The two samples both tested positive for methamphetamine.

**I.    Methamphetamine Lab Test Results**

34.  On February 25, 2022, I received a Chemical Analysis Report from the Drug Enforcement Administration for the suspected methamphetamine purchased from **GOMEZ** on February 7, 2022. The results showed that the suspected methamphetamine tested positive for methamphetamine hydrochloride with a net weight of 897 grams with a purity of 98%.

**J.    April 6, 2022: Attempted Purchase of Two Firearms, Arrest, and Seizure of the SUBJECT DEVICE**

35.  On or about April 6, 2022, the UC agent and **GOMEZ** were in contact and agreed to meet for **GOMEZ** to sell the UC two firearms. At approximately 4:35 pm, **GOMEZ** arrived at the UC location in the same Red Dodge Durango he had previously used. **GOMEZ** was the sole occupant in the vehicle. **GOMEZ** and the UC agent met and **GOMEZ** took out two pistol boxes containing two

firearms from his backpack. ATF agents then arrested **GOMEZ.** In the front passenger seat of **GOMEZ**'s car, plugged into the charger, was the **SUBJECT DEVICE. GOMEZ** provided consent to search the **SUBJECT DEVICE**, and gave the arresting agents his passcode for the **SUBJECT DEVICE.**

> **K.   Criminal History**

36.   On March 4, 2022, I reviewed certified conviction documents for **GOMEZ** and learned that **GOMEZ** has previously been convicted of the following felony crime punishable by a term of imprisonment exceeding one year:

37.   On or about March 15, 2005, **GOMEZ** was convicted of Carrying a Concealed Firearm on his Person, in violation of California Penal Code § 12025(a)(2), in the Superior Court of the State of California, County of Los Angeles, Case Number BA269653.

38.   On or about July 17, 2007, **GOMEZ** was convicted of Possession of a Firearm by a Felon, in violation of California Penal Code § 12021(a)(1), and Possession For Sale of a Controlled Substance in violation of California Health and Safety Code section 11378, in the Superior Court of the State of California, County of Los Angeles, Case Number BA325138.

> **L.   Interstate Nexus Determination**

39.   On March 1, 2022, I reviewed a report by ATF SA Lamphere, an ATF Interstate Nexus Expert, who examined the firearms purchased from **GOMEZ** and determined the following:

a. One firearm is a Kel-Tec CNC Industries Inc., model PLR-16, 5.56mm caliber pistol bearing serial number P2J47,

manufactured by Kel-Tec CNC Industries, Inc. in Cocoa, Florida. In order for this firearm to have been recovered in California, it had to have moved in interstate commerce.

      b. One firearm is a Ruger model Ruger-57, 5.7x28mm caliber pistol, bearing serial number 643-34526, manufactured by Sturm, Ruger & Co, Inc. in Prescott, Arizona. In order for this firearm to have been recovered in California, it had to have moved in interstate commerce.

      c. One firearm is a Glock model 22, .40 caliber pistol, bearing serial number BUHP783, manufactured by Glock GmbH in Austria. In order for this firearm to have been recovered in California, it had to have moved in foreign commerce.

      d. One firearm is a FN model FNX-45 Tactical, .45 ACP caliber pistol, bearing serial number FX3U121799, manufactured by FN America, LLC in Columbia, South Carolina. In order for this firearm to have been recovered in California, it had to have moved in interstate commerce.

      e. One firearm is a Kimber model Stainless II, .45 caliber pistol, bearing serial number K570749, manufactured by Kimber Mfg. Inc. in Yonkers, New York. In order for this firearm to have been recovered in California, it had to have moved in interstate commerce.

      f. One firearm is a Kel-Tec CNC Industries Inc., model SU-16, 5.56mm caliber rifle, bearing serial number N4B62, manufactured by Kel-Tec CNC Industries, Inc. in Cocoa, Florida.

In order for this firearm to have been recovered in California, it had to have moved in interstate commerce.

g. One firearm is a Ruger model P89, 9mm caliber pistol, bearing serial number 310-39115, manufactured by Sturm, Ruger & Co. Inc. in Prescott, Arizona. In order for this firearm to have been recovered in California, it had to have moved in interstate commerce.

h. One firearm is a Taurus model PT145, .45 ACP caliber pistol, bearing serial number NVB50692, manufactured by Taurus International Mfg., Inc. in Brazil. In order for this firearm to have been recovered in California, it had to have moved in foreign commerce.

i. One firearm is a Beretta model 9000S, 9mm caliber pistol, bearing serial number SZ001966, manufactured by Fabbrica d'Armi Pietro Beretta S.p.a in Italy. In order for this firearm to have been recovered in California, it had to have moved in foreign commerce.

j. One firearm is a Colt model New Service 455 Eley, .455 caliber revolver, bearing serial number 121653, manufactured by Colt's Manufacturing Company, LLC in Hartford, Connecticut. In order for this firearm to be recovered to have been recovered in California, it had to have moved in interstate commerce.

k. One firearm is a Marlin Firearms Glenfield model 60, .22 LR caliber rifle, bearing serial number 24381048, manufactured by Marlin Firearms in North Haven, Connecticut. In

order for this firearm to have been recovered in California, it had to have moved in interstate commerce.

l. One firearm is a Universal Firearms model M1, .30 caliber rifle, bearing serial number 453307, manufactured by Universal Firearms in Hialeah, Florida. In order for this firearm to have been recovered in California, it had to have moved in interstate commerce.

m. One firearm is a Norinco model 56S-1, 7.62 caliber rifle, bearing serial number 515774, manufactured by Norinco, China North Industries Corp. in China. In order for this firearm to have been recovered in California, it had to have moved in foreign commerce.

n. Twenty-three firearms are Armscor of the Philippines model M1911-A1 FS, .45 caliber pistols, bearing serial numbers RIA2477444 through RIA2477457, RIA2477250, RIA2477251, and RIA2477535 through RIA2477541, manufactured by Arms Corporation of the Philippines in the Philippines and imported by Armscor Precision International in Pahrump, Nevada. In order for these firearms to have been recovered in California, they had to have moved in interstate and foreign commerce.

## V.  <u>TRAINING AND EXPERIENCE ON FIREARMS OFFENSES</u>

40.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.   Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such as in their digital devices. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices on their person and in backpacks or purses in their vicinity.

b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.   Those who illegally possess firearms sometimes sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the

unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d.   Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DRUG OFFENSES

41.   Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as in their homes and other homes such as stash houses, and on their cell phones and other digital devices.

c.    Communications between people buying and selling drugs takes place by telephone calls and messages, such as email, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send thesephotos to each other and others to boast about the drugs or facilitate drug sales.

d.    Drug traffickers often keep the names, addresses,and telephone numbers of their drug trafficking associates in their residences, vehicles, and on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

e.    Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f.    Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis. Such currency is often stored in their residences and vehicles.

g.    Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in

17

safes. They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers. These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VII. __TRAINING AND EXPERIENCE ON DIGITAL DEVICES__

42.   As used herein, the term "digital device" includes the **SUBJECT DEVICE.**

43.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the

18

hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading

filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

44. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

45. The search warrant requests authorization to use the biometric unlock features of a device, based on the following,

which I know from my training, experience, and review of
publicly available materials:

a.   Users may enable a biometric unlock function on
some digital devices. To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device. To unlock
a device enabled with a fingerprint unlock function, a user
places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second. To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts. Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.

c.   Thus, the warrant I am applying for would permit
law enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of
the warrant: (1) depress **GERMAN GOMEZ'**s thumb- and/or fingers on
the device(s); and (2) hold the device(s) in front of **GERMAN
GOMEZ'**s face with his or her eyes open to activate the facial-,
iris-, and/or retina-recognition feature.

46.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VIII.    CONCLUSION

47.   For all of the reasons described above, there is probable cause to believe that **GERMAN GOMEZ** has committed a violation of 21 U.S.C. § 841(a)(1): Distribution of Methamphetamine.

48.   Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found on the **SUBJECT DEVICE**, as described more fully in Attachment A.

Attested to by the applicant in
accordance with the requirements of
Fed. R. Crim. P. 4.1 by telephone on
this _7th_ day of _April_____, 2022.

_____
THE HONORABLE JOHN MCDERMOTT
UNITED STATES MAGISTRATE JUDGE